[Cite as *State v. Davis*, 2017-Ohio-495.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

CLINTON COUNTY


| | | |
|---|---|---|
| STATE OF OHIO, | : | |
| Plaintiff-Appellee, | : | CASE NO.   CA2015-12-022 |
| | : | O P I N I O N |
| - vs - | | 2/13/2017 |
| | : | |
| PHILLIP T. DAVIS, | : | |
| Defendant-Appellant. | : | |


CRIMINAL APPEAL FROM CLINTON COUNTY COURT OF COMMON PLEAS
Case No. CRI 2014-5184


Richard W. Moyer, Clinton County Prosecuting Attorney, Brian Shidaker, 103 East Main Street, Wilmington, Ohio 45177, for plaintiff-appellee

Andrea G. Ostrowski, 20 South Main Street, Springboro, Ohio 45066, for defendant-appellant


**RINGLAND, J.**

{¶ 1}  Defendant-appellant, Phillip Davis, appeals his conviction and sentence in the Clinton County Court of Common Pleas on multiple drug-related offenses.  For the reasons detailed below, we affirm.

{¶ 2}  On September 8, 2014, Davis was indicted on 520 separate drug counts.  The state amended the indictment and eventually chose to proceed on substantially fewer counts.

Following a jury trial, Davis was found guilty of: (1) one count of engaging in corrupt activity in violation of R.C. 2923.32, a first-degree felony, (2) one count of illegal manufacture of drugs in violation of R.C. 2925.04, a second-degree felony, (3) twenty-three counts of trafficking in cocaine in violation of R.C. 2925.03, four of which were first-degree felonies while the remaining 19 were fifth-degree felonies, and (4) one count of aggravated trafficking in drugs in violation of R.C. 2925.03, a third-degree felony. Several counts carried enhancement specifications for exceeding the bulk amount of drugs.

{¶ 3} Davis' convictions were the result of a lengthy investigation into the Marlena Park Gang, a regional drug network believed to engage in drug trafficking, manufacturing, and welfare fraud. A joint task force of local and federal authorities engaged in a process of identifying the operational structure of the organization.

{¶ 4} Through surveillance equipment and the controlled purchase of drugs by confidential informants and undercover police officers, the task force identified Khalif Zione as a major figure in the organization. Following the issuance of numerous search warrants, law enforcement officials were eventually able to obtain a federal wiretap authorization for Zione's phone with the intended purpose of identifying Zione's drug supplier.

{¶ 5} As a result of the federal wiretap authorization, Davis was identified as Zione's drug supplier and potential "higher up" in the organization's chain of command. As the investigation shifted its focus to Davis, authorities obtained a federal wiretap authorization for Davis' phone. As part of their investigation, authorities identified Davis as the leader of the organization. The recorded phone conversations between Davis and others highlighted his role in the organization. Davis would direct Zione, and other members of the organization, in the trafficking of drugs. In addition, Davis would direct drug users to organization members who could supply them with drug products. Davis was the only supplier for the organization.

{¶ 6} During the jury trial, the state presented evidence from several members of the

joint task force who listened to the wiretapped conversations and engaged in the lengthy investigation. In addition, the state presented the testimony of several drug users and couriers who were recorded on the wiretapped conversations arranging drug purchases with Davis and his associates.

{¶ 7} Detective Baker with the Wilmington Police Department and the Warren County Drug Taskforce testified at length about the investigation leading to Davis' arrest. Detective Baker explained the process that was used in identifying major players in the organization and the procedure used for obtaining the federal wiretap. Specifically, Detective Baker testified that the wiretap authorization lasted 70 days and the task force intercepted over 20,000 phone calls, 80 percent of which were pertinent calls and text messages referencing drug trafficking.

{¶ 8} Detective Baker stated that during the course of the investigation, he learned to identify each individual's voice and testified about his extensive knowledge of and familiarity with the Marlena Gang's code language. For example, Detective Baker identified several locations and named several individuals involved in the drug activity:

Important Locations:

| The Hill | The Hill is code language referring to the 400 block of Howard Street, near the intersection of Vine and Howard Street in Wilmington, Clinton County, Ohio. The Hill is located near the Wilmington High School. |
| --- | --- |
| The Trap House | The Trap House was the name given to the apartment rented by Joyce Dallas located at 460 S. South Street, Wilmington, Clinton County, Ohio, Apt. One. |

Important individuals:

| Scott Kline

a.k.a. The Mailman | Kline was a daily user of crack cocaine, as well as a driver for Davis' trafficking organization. Davis would also use Kline to |
| --- | --- |

| | deliver drugs and instrumentalities for the manufacture of drugs. |
|---|---|
| Joyce Dallas | Dallas was the tenant of the Trap House. Dallas would allow Davis to traffic drugs in her house and would facilitate drug purchases on behalf of Davis |
| Deborah Ortiz<br><br>a.k.a. Deb | Deb was Davis' main courier. Deb would drive Davis to his supplier for large quantities of drugs to be resold through the organization. |
| Khalif Zione | Zione was a drug dealer involved with Davis' organization. Zione regularly dealt drugs out of the Trap House during the daytime. |
| Jerrell Smith<br><br>a.k.a. VIP | VIP was a drug dealer involved with Davis' organization. |
| Miles Gardiner | Miles was a drug dealer involved with Davis' organization. Miles regularly dealt drugs out of the Trap House in the overnight hours, after 11:00 PM. |
| Julian Gatin<br><br>a.k.a. Flush | Gatin was a drug dealer and courier associated with Davis' organization. Gatin would stay at the Trap House and was directed to make drug transactions |
| Christina Hurn | Hurn was Davis' girlfriend and also known as a drug courier. |
| Jason Thompson | Thompson was Davis' supplier for drugs. Davis was the only person in the organization to contact Thompson. |
| Derek Davis<br><br>a.k.a. D-Block | D-Block was Davis' brother and another drug dealer associated with the organization. |

{¶ 9} Kline testified for the state. In his testimony, Kline admitted that he was addicted to crack cocaine and described how Davis would transact, manufacture, and package drugs in Clinton County. Kline explained that he had purchased "a lot of crack" from Davis at the Hill, the Trap House, a gas station in Clinton County, and had even allowed Davis to manufacture crack cocaine at his house. Kline admitted that on several occasions

he supplied instrumentalities that Davis used in the manufacture of crack cocaine.

{¶ 10} The majority of Kline's testimony, however, involved the use of the wiretapped phone conversations occurring between himself and Davis. Throughout that portion of his testimony, Kline authenticated and corroborated the information contained in those recordings, specifically noting that he was purchasing crack cocaine from Davis, the amount of drug to be purchased, and the location of where the purchase was to occur.

{¶ 11} Next, the state presented testimony from Deb and Dallas, both of whom testified about their respective involvement in Davis' drug operation. Deb testified that she was a daily user of crack cocaine and would purchase drugs from Davis. In addition, Deb admitted that she would drive and deliver drugs for Davis in exchange for drugs and other forms of compensation. Sometimes, Deb would drive Miles Gardiner to make drug transactions on Davis' behalf. However, Deb would also drive Davis to his supplier in Dayton to make larger purchases. As the state did with Kline, Deb was also asked to explain and authenticate recorded conversations between herself and Davis, wherein the two either communicated about the need for transportation or the purchase of crack cocaine.

{¶ 12} Dallas testified next and identified the "Trap House," as her former residence in Wilmington, which she described as the "hot house" for the selling of crack cocaine. Dallas explained that Davis sold the drugs out of her house and would compensate her with crack cocaine. Eventually, Davis, D-Block, Miles, and VIP began using the house to sell drugs. In fact, Dallas detailed the reason why the location was identified as the "Trap House."

> PROSECUTOR: Okay. What were you receiving? Were you receiving anything in return?
>
> DALLAS: A little bit at that point in time, but not a whole lot.
>
> PROSECUTOR: A little bit of what?

DALLAS: Crack cocaine

PROSECUTOR: Is it fair to say that you and the Defendant, Phillip Davis, came to an agreement?

DALLAS: Yes, sir.

PROSECUTOR: What did that agreement look like to you?

DALLAS: Well, sometimes it was a mutual agreement, but other times it was said, my fault. I didn't speak up much for myself. I didn't say a whole lot for myself. It just kind of ruined (indiscernible) feel pretty good - -

PROSECUTOR: Okay.

DALLAS: - -what he was doing with me. By serving the crack, I shut up mostly, you know. He had a ball over my head.

PROSECUTOR: So, you felt trapped?

DALLAS: Yeah, I was trapped. I felt that, and they started calling it the trap - - the house of trap - - trap house because of that. So - -

PROSECUTOR: That's what they call your house?

DALLAS: They did, yes.

PROSECUTOR: Did you hear Phillip Davis call your house the trap house?

DALLAS: Yeah, yeah. I felt him - - he said it real well that night that my house got broke in and we were playing cards. He though (indiscernible) trap house and about that time, it will hit.

PROSECUTOR: What does trap house mean to you?

DALLAS: Crack house. People smoke the crack out of it. You know, that's what it was. Let them stay and smoke crack, I reckon, you know, come and go all night long and morning hours. I didn't like that, but we'd sit there and smoke crack. * * *

{¶ 13} Dallas further explained that she often acted as the "go between," acting as the person who would exchange drugs from Davis, Miles, or Zione for the money provided by the user. As with Ortiz and Kline, the state presented audio recordings capturing Dallas

arranging drug transactions between herself and Davis, as well as arranging drug purchases on behalf of third persons for Davis.

{¶ 14} Following the close of evidence, the jury deliberated and returned guilty verdicts on each charge requested at trial. As a result of his convictions, Davis was sentenced to an aggregate 18-year prison term. Davis now appeals his convictions and sentence, raising five assignments of error for review.

{¶ 15} Assignment of Error No. 1:

{¶ 16} THE DEFENDANT'S CONVICTIONS ARE NOT SUPPORTED BY SUFFICIENT EVIDENCE.

{¶ 17} In his first assignment of error, Davis argues that his convictions are not supported by sufficient evidence. Following a thorough review of the record, we find Davis' arguments to be without merit.

{¶ 18} When reviewing the sufficiency of the evidence underlying a criminal conviction, an appellate court examines the evidence in order to determine whether such evidence, if believed, would support a conviction. *State v. Boles*, 12th Dist. Brown No. CA2012-06-012, 2013-Ohio-5202, ¶ 34. The relevant inquiry is "whether, after viewing the evidence in a light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime proven beyond a reasonable doubt." *State v. Watson*, 12th Dist. Warren No. CA2014-08-110, 2015-Ohio-2321, ¶ 22. In other words, the test for sufficiency requires a determination as to whether the state has met its burden of production at trial. *State v. Wilson*, 12th Dist. Warren No. CA2006-01-007, 2007-Ohio-2298, ¶ 34.

{¶ 19} As noted above, Davis was convicted of: (1) one count of engaging in corrupt activity, (2) one count of illegal manufacture of drugs, (3) twenty-three counts of trafficking in cocaine, and (4) one count of aggravated trafficking in drugs. In this case, Davis argues that

the state failed to prove that Clinton County was the proper venue and also alleges that many of his convictions are based on "a lot of assumptions" and "a lot of inferences," but maintains that "the actual facts remain elusive." We will address each charge separately.

## I. **Venue**

{¶ 20} We first address Davis' argument that the state failed to prove that Clinton County was the proper venue for at least some of the counts alleged in the indictment and, therefore, his convictions are not supported by sufficient evidence.

{¶ 21} "Venue commonly refers to the appropriate place of trial for a criminal prosecution within a state." *State v. Meridy*, 12th Dist. Clermont. No. CA2003-11-091, 2005-Ohio-241, ¶ 12. The importance of venue is to give the defendant the right to be tried in the vicinity of his alleged criminal activity. *Meridy* at ¶ 12. The standard to establish venue is whether appellant has a "significant nexus" with the county where the trial was held. *Id.* at ¶ 22; *State v. Stone*, 12th Dist. Warren No. CA2007-11-132, 2008-Ohio-5671, ¶ 16. As a result, and pursuant to R.C. 2901.12, Ohio's venue statute, "[t]he trial of a criminal case in this state shall be held in a court having jurisdiction of the subject matter, and in the territory of which the offense or any element of the offense was committed." R.C. 2901.12(A).

{¶ 22} Venue is not a material element of any offense charged. *Meridy* at ¶ 12. However, the prosecution must prove beyond a reasonable doubt that the crime charged was committed in the county where the indictment was returned and the trial held, unless the issue of venue is waived by the defendant. *Id.* "A defendant waives the right to challenge venue when the issue is raised for the first time on appeal." *State v. McCollum*, 12th Dist. Clermont No. CA2014-11-077, 2015-Ohio-3286, ¶ 10.

{¶ 23} In this case, Davis failed to challenge Clinton County as a proper venue at trial. In turn, because Davis raises the issue for the first time on appeal, he has waived any challenge except for plain error. *State v. Mielke*, 12th Dist. Warren No. CA2012-08-079,

2013-Ohio-1612, ¶ 16.

{¶ 24}  Plain error exists where there is an obvious deviation from a legal rule which affected the defendant's substantial rights, or influenced the outcome of the proceeding. *State v. Craycraft*, 12th Dist. Clermont Nos. CA2009-02-013 and CA2009-02-014, 2010-Ohio-596, ¶ 23.  Notice of plain error is taken with the utmost caution, under exceptional circumstances, and only to prevent a manifest miscarriage of justice.  *State v. Grisham*, 12th Dist. Warren No. CA2013-12-118, 2014-Ohio-3558, ¶ 38.  Therefore, we will not reverse the trial court's decision unless the outcome of trial would have been different but for the alleged error.  *State v. Dougherty*, 12th Dist. Preble No. CA2013-12-014, 2014-Ohio-4760, ¶ 53.

{¶ 25}  As previously noted, Ohio's venue statute, R.C. 2901.12, provides that "trial of a criminal case in this state shall be held in a court having jurisdiction of the subject matter, and * * * in the territory of which the offense or any element of the offense was committed." R.C. 2901.12(A).  R.C. 2901.12(H) addresses venue when an offender commits offenses in different jurisdictions as part of a course of criminal conduct and provides, in pertinent part:

> When an offender, as part of a course of criminal conduct, commits offenses in different jurisdictions, the offender may be tried for all those offenses in any jurisdiction in which one of those offenses or any element of one of those offenses occurred.  Without limitation on the evidence that may be used to establish the course of criminal conduct, any of the following is prima-facie evidence of a course of criminal conduct:
>
> * * *
>
> (3) The offenses were committed as part of the same transaction or chain of events, or in furtherance of the same purpose or objective.
>
> * * *
>
> (5) The offenses involved the same or a similar modus operandi.

{¶ 26}  Davis was charged with one count of engaging in corrupt activity in violation of R.C. 2923.32, which states that "[n]o person employed by, or associated with, any enterprise

- 9 -

shall conduct or participate in, directly or indirectly, the affairs of the enterprise through a pattern of corrupt activity." For purposes of this case, "corrupt activity" means "engaging in, attempting to engage in, conspiring to engage in, or soliciting, coercing, or intimidating another person to engage in" a violation of R.C. 2925.03 or R.C. 2925.04.

{¶ 27} With the offense of engaging in a pattern of corrupt activity, the state alleged that Davis was the leader of the Marlena Park Gang, a crime ring that operated in Wilmington and Clinton County. In furtherance of their operations, Davis sold, directed to be sold, and organized the purchase of drugs. As discussed in more detail below, the state presented dozens of audio recordings of wiretapped communications between Davis and his drug buyers arranging drug purchases in Clinton County at the Hill and the Trap House. Consequently, evidence was presented that Davis' drug operation was conducted in Clinton County.

{¶ 28} Therefore, at least one element of the offense of engaging in a pattern of corrupt activity took place in Clinton County. As previously held, venue is proper "in any county in which a portion of the corrupt activity occurred or in which an organization formed for the purpose of engaging in corrupt activity is based." *Mielke*, 2013-Ohio-1612 at ¶ 23. Therefore, we find venue in Clinton County was appropriate on the engaging in a pattern of corrupt activity charge, as well as on all charges within Davis' course of criminal conduct.

## II. Convictions

### A. Trafficking in Cocaine without specifications

{¶ 29} The bulk of Davis' convictions are for separate instances in which Davis offered to sell drugs. R.C. 2925.03 states:

> (A) No person shall knowingly do any of the following:
>
> (1) Sell or offer to sell a controlled substance or a controlled substance analog;

- 10 -

"Undoubtedly, a person can be convicted for offering to sell a controlled substance in violation of R.C. 2925.03(A)(1) without actually transferring a controlled substance to the buyer." *State v. Chandler*, 109 Ohio St.3d 223, 2006-Ohio-2285, ¶ 9.

{¶ 30} In the present case, the state largely proved its case through the use of circumstantial evidence and the use of audio-recorded telephone communications. Kline testified that he had been purchasing crack cocaine from Davis, both directly and through Davis' associates, for approximately eight years. During the period of time relevant to this case, Kline testified that he was a daily user of crack cocaine and was in contact with Davis nearly every day. Kline testified that their communications were generally very brief and they would both use slang or jargon to set up the drug deal.

PROSECUTOR: And so, when you would call and he would say what's up, what would your typical response be?

KLINE: I need a certain amount.

PROSECUTOR: And how would you phrase that?

KLINE: Say I need a three or a four, which would be $30 or $40.

PROSECUTOR: You would never say I need three grams of crack cocaine?

KLINE: No.

PROSECUTOR: Or four grams of crack cocaine?

KLINE: No.

PROSECUTOR: Why wouldn't you phrase it in those terms?

KLINE: Just not done.

PROSECUTOR: It's not done?

KLINE: It's just that the procedure's not done.

PROSECUTOR: It's not done generally in the industry?

KLINE: Yeah.

- 11 -

PROSECUTOR:  And why is that?

KLINE:  In case somebody's listening and just seems to - -

PROSECUTOR:  Does it make people nervous?

KLINE:  Yeah.

PROSECUTOR: Okay. When you say people may be listening, who were you referring to?

KLINE:  Federal groups or state groups.

PROSECUTOR:  You mean law enforcement might have a phone tapped?

KLINE:  Yes.

PROSECUTOR:  Your conversations would be minimal?

KLINE:  Yes.

PROSECUTOR:  For that reason?

KLINE:  Yes.

PROSECUTOR:  When you say a three or a four, that refers to 30 or $40 worth?

KLINE:  Yes.

PROSECUTOR:  And how much crack would you get for a three?

KLINE:  Three-tenths of a gram.

PROSECUTOR:  Three-tenths of a gram.  And how much crack would you get for a four?

KLINE:  Four-tenths of a gram.

{¶ 31}  Following further elaboration as to common practices in drug sales, the state then played a series of recorded conversations between Davis and Kline arranging drug transactions.  After the introduction of each series of conversations, Kline would testify that the recording accurately reflected the conversation and corroborate the account.  This same

procedure was done with Dallas and Deb in their respective testimonies. We have carefully reviewed each count and find the state presented sufficient evidence of the following 19 counts summarized in the chart below.

| Count | Date | Summary |
| --- | --- | --- |
| 16 | November 5, 2013 | Davis offered to sell Kline 1.2 grams of crack cocaine, later reaffirming the offer and arranging to deliver the drugs to Kline's residence. |
| 17 | November 6, 2013 | Davis offered to sell Kline .2 grams of crack cocaine and directs him to meet at the Hill. |
| 87 | November 13, 2013 | Davis offered to sell Kline .3 grams of crack cocaine and directs him to meet at the Hill. |
| 112 | November 16, 2013 | Davis offered to sell Kline .8 grams of crack cocaine and directs him to meet at the Hill. |
| 133 | November 18, 2013 | Kline calls Davis to ask for a "front." Davis agrees to front Kline .2 grams of crack cocaine and states that he will have Miles give it to him at Deb's house in Clinton County. |
| 154 | November 21, 2013 | Davis offered to sell Kline .4 grams of crack cocaine and directs him to meet at the Hill, which is the default location for their drug exchanges. |
| 166 | November 23, 2013 | Davis offered to sell Kline .4 grams of crack cocaine and directs him to the Hill. Davis also requested that Kline bring a Pyrex dish, baking soda, a hanger, and a scale for the manufacture of crack cocaine. |
| 174 | November 23, 2013 | Davis offered to sell Kline .2 grams of crack cocaine and directs him to meet at the Hill. |
| 176 | November 24, 2013 | Davis offered to sell Kline .3 grams of crack cocaine and directs him to meet at the Trap House. Kline also complains about the prior night's crack cocaine that Miles delivered to him. |
| 190 | November 26, 2013 | Davis offered to sell Kline .3 grams of crack cocaine and directs him to meet at the Hill. |
| 197 | November 27, 2013 | Davis offered to sell Kline .3 grams of crack cocaine and directs him to meet at the Hill. |
| 218 | November 30, 2013 | Davis offered Dallas .2 grams of crack cocaine. Dallas testified that the crack cocaine was for an unspecified third party. |
| 228 | December 2, 2013 | Davis offered to sell Kline .4 grams of crack cocaine and directs him to meet at the Hill. |
| 239 | December 3, 2013 | Davis offered to sell Kline .2 grams of crack |

| | | |
|---|---|---|
| | | cocaine and directs him to meet at the Hill. |
| 247 | December 3, 2013 | Davis offered to sell Kline 1.2 grams of crack cocaine and directs him to meet at the Trap House. |
| 268 | December 5, 2013 | Davis offered to sell Kline crack cocaine and directs him to meet at the Speedway in Wilmington. Kline replies that he has $20 and Vicodin pills to trade. |
| 337 | December 15, 2013 | Davis directs Miles to give Dallas and Deb .2 grams of crack cocaine in exchange for driving. |
| 350 | December 16, 2013 | Davis takes an order for .4 grams of crack cocaine from an individual, Sonja Hughes, and then directs Zione to complete the transaction |
| 435 | December 28, 2013 | Davis offered to sell Kline .5 grams of crack cocaine and directed him to a Wilmington residence. |

## B. Trafficking in Cocaine with specifications

{¶ 32} In addition, Davis was convicted of four additional counts of trafficking in cocaine. Unlike the convictions mentioned previously, these convictions included a specification based on the weight of drugs. The specification providing a penalty enhancement is contained in R.C. 2925.03(C)(4). As relevant here, that statute provides:

> (4) If the drug involved in the violation is cocaine or a compound, mixture, preparation, or substance containing cocaine, whoever violates division (A) of this section is guilty of trafficking in cocaine. The penalty for the offense shall be determined as follows:
>
> * * *
>
> (d) Except as otherwise provided in this division, if the amount of the drug involved equals or exceeds ten grams but is less than twenty grams of cocaine, trafficking in cocaine is a felony of the third degree * * *.
>
> (f) If the amount of the drug involved equals or exceeds twenty-seven grams but is less than one hundred grams of cocaine * * * trafficking in cocaine is a felony of the first degree.

{¶ 33} The Ohio Supreme Court has issued several decisions relevant to such

- 14 -

enhancement specifications. In *State v. Chandler*, 109 Ohio St.3d 223, 2006-Ohio-2285, the Ohio Supreme Court held that a substance offered for sale must contain some detectable amount of the relevant controlled substance before a person can be sentenced as a major drug offender. *Id.* at ¶ 21. There, the Court reversed a defendant's classification as a major drug offender because testing revealed that the substance involved was baking soda, not cocaine, and therefore the jury's finding that the amount of the drug equaled or exceeded 100 grams of crack cocaine was contrary to fact. *Id.* at ¶ 19.

{¶ 34} In *Garr v. Warden, Madison Correctional Inst.*, 126 Ohio St.3d 334, 2010-Ohio-2449, the Ohio Supreme Court was asked on a certified question from federal court whether the holding in *Chandler* "extends to an offer-to-sell drug-trafficking case where no drugs are recovered during investigation of the crime." *Garr* at ¶ 1. The Ohio Supreme Court answered the question in the negative and clarified that its holding in *Chandler* "does not extend to cases where a substance offered for sale is not recovered or tested in order to ascertain whether it contains a detectable amount of a controlled substance." *Id.* at ¶ 2. In reaching its decision in *Garr*, the Court reasoned that "*Chandler* did not address the principle that the state can establish any element of any crime through circumstantial evidence." *Garr* at ¶ 27. Therefore, the Court limited its holding and concluded that *Chandler*:

> [I]s limited to those cases where the substance offered for sale is recovered and subjected to testing to determine whether it contains a detectable amount of the drug offered for sale. *It does not apply to situations where no drug is recovered and no testing is performed.* Hence, where an offender offers to sell a controlled substance in a quantity that would implicate the MDO (major drug offender) specification, and where no substance is ever recovered or tested, Chandler is factually distinguishable, as it is a counterfeit drug case where the alleged drug was recovered and tested. Therefore, Chandler does not apply to the situation as presented here where Garr offered to sell a drug that was not recovered. In such a case, the offender may be convicted of an MDO specification in a properly proven case.

*Garr* at ¶ 28 (Emphasis added).[1]

{¶ 35} In the present case, the state did not introduce the drugs into evidence, but instead proved its case through the use of circumstantial evidence, i.e., the voluminous records of calls between Davis and his associates. As held by *Garr*, the pronouncement contained in *Chandler* does "not apply to situations where no drug is recovered and no testing is performed." *Garr*, 126 Ohio St.3d 334 at ¶ 28. The *Chandler* decision is factually distinguishable. Accordingly, for purposes of the remaining counts, we hold that Davis may be convicted of the weight specifications "in a properly proven case." *See id.*

{¶ 36} **1. Count 444: Violation of R.C. 2925.03(A)(1) with specification**

{¶ 37} As with the prior counts, Count 444 also involved an offer to sell under R.C. 2925.03(A)(1). Here, the state presented evidence that on December 29, 2013, Zione called Davis and stated that he had a customer with $1,300, which, as explained by Detective Baker is consistent with the purchase price of one ounce of cocaine. Davis then calls D-Block and directs him to make the transaction. The evidence therefore shows Davis' willingness to sell a controlled substance in violation of the relevant statute, and the amount therein offered was in excess of 27 grams, but less than one 100 grams for purposes of the specification. *See e.g., State v. Ponce*, 8th Dist. Cuyahoga No. 91329, 2010-Ohio-1741, ¶ 20 ("[i]n order to prove an offer to sell a controlled substance, the State need only show evidence of one's willingness to transfer drugs to another person.) As a result, we find sufficient evidence to sustain Davis' conviction for a violation of R.C. 2925.03(A)(1) with the specification.

**2. Counts 291, 168, and 149: Violations of R.C. 2925.03(A)(2) with specifications**

---

1. We note that the Ohio Supreme Court recently addressed another case involving the weight of cocaine in *State v. Gonzales*, Slip Opinion No. 2016-Ohio-8319, which held that interpretation of R.C. 2925.11(C)(4)(b) required the state to prove the actual amount of cocaine, excluding filler materials. *Id.* at ¶ 1. However, the Court distinguished cases like *Garr* where "no drugs were recovered during the investigation of the crime." *Id.* at ¶ 21.

{¶ 38} Unlike the previous convictions, the remaining three counts involve not the offer to sell or sale, but rather the preparation for sale or the transport of a controlled substance for sale. Pursuant to R.C. 2925.03(A)(2):

> (A) No person shall knowingly do any of the following:
>
> * * *
> (2) Prepare for shipment, ship, transport, deliver, prepare for distribution, or distribute a controlled substance or a controlled substance analog, when the offender knows or has reasonable cause to believe that the controlled substance or a controlled substance analog is intended for sale or resale by the offender or another person.
>
> * * *.

### i. Count 291

{¶ 39} As to Count 291, the state presented evidence that on December 9, 2012, Davis contacted Payne, his drug supplier, and stated that he was "[c]hecking on ole girl," which the testimony reflects is a slang term for cocaine. When quoted the price of "12 5," Davis states "one of 'em." The state also introduced evidence that $1,250 was a standard price for the purchase of one ounce of cocaine, and amounts to 28 grams of cocaine. In subsequent conversations, Davis calls his wife and asks if he has enough time to cook the cocaine into crack at their house before their children come home. Several minutes later, Davis confirms that he's almost done cooking. A little while later, Davis calls Kline and Zione stating that he has the "straight drop"[2] and he's on his way to Wilmington. The rest of the evening, the phone conversations reveal that Davis took several orders for the drug and resupplied his brother, D-Block, finally arriving at the Trap House at 11:42 PM.

{¶ 40} Accordingly, the record supports a finding that Davis purchased an ounce of cocaine, 28 grams, from Payne, transported the drug to his house where it was cooked into

---

2. Kline testified that "straight drop" is crack cocaine that has a high potency.

crack cocaine, and then drove to Wilmington making sales and resupplying his brother before finally arriving at the Trap House. Therefore, Davis's Count 291 conviction under R.C. 2925.03(A)(2) with a special finding that the amount of cocaine exceeded 27 grams, but was less than 100 grams was supported by sufficient evidence.

ii. Count 168

{¶ 41} As to Count 168, the state presented evidence that on November 23, 2013, Davis had a detailed conversation with VIP regarding their plans to split the purchase of one ounce of cocaine and manufacture it into crack cocaine. At 6:19 PM, Davis asks Kline for a Pyrex dish, baking soda, a hanger, and an "eyeball," i.e., scale, and tells him to meet on the Hill in Wilmington. At 6:21 PM, VIP and Davis have another lengthy conversation. Detective Baker summarized the discussion as follows:

> A. In the conversation, Phillip Davis is telling [VIP] that he (indiscernible) manufacturing crack cocaine and who he's bringing (indiscernible). And [VIP] has money into this. So, if the crack cocaine gets messed up during that manufacturing process, [VIP] doesn't want to be out the money. He wants that to fall back on [Davis].
>
> Q. When he refers to putting it in the microwave and dropping water and baking soda on it, is that consistent with your understanding of the manufacturing of crack?
>
> A. Yes.
>
> Q. And when [Davis] says, quote, "this coke here I like it because it's like the truth." What do you take that to mean when he says, "this coke here is like the truth"?
>
> A. The cocaine is a higher quality. You know, later on in the conversation, they talk about cocaine more – the poor quality that they've been buying. And it's basically what's going on in that process is a lot of these guys once they get – if they have an ounce of cocaine, they may mix that ounce of cocaine with powdered sugar or any other kind of stuff so that they made one ounce into two ounces. Instead of making $1200 on a transaction, they can make $2400 on a transaction.

At 10:49 PM, Davis and VIP again converse, Detective Baker summarizes the discussion as

follows:

>DETECTIVE BAKER. [VIP] wants [Davis] to give [Kline] his portion of what they just purchased because they were talking about in the conversations before how they were going to split it. They split money, put money into the pot.

>And upon splitting that, he's giving – [Davis] is giving [Kline] the half ounce of crack cocaine. And [Kline], as I previously stated in the other calls, is to take that to Washington Courthouse for [VIP] to make money.

>PROSECUTOR. And when he asks him to bust it into t-shirts, what does that mean?

>DETECTIVE BAKER. Just breaking it down, you know, to 12 t-shirts, which for us it's not a very common street term, and we believe to be that one gram bags.

{¶ 42} At 11:58 PM, Davis and VIP speak again and Davis informs him that he is trying to figure out where he is going to "break this down at." VIP suggests that Davis "bust it down in the car." VIP then asks "[h]ow that shit looking man? That shit that crumbly bumbly shit? Davis replies that "No it ain't crumble. It's straight solid." According to Detective Baker,

>DETECTIVE BAKER. Crumbly is just a poor quality crack cocaine.

>When he's talking about no, that it's hard, it's not wet, it's a decent quality crack cocaine.

>But if it crumbles, it's really no good to the user because they're going to have a lot of smaller pieces. They're looking for that chunk when they buy that chunk, whether it's a 20, 30, 40 or $50 piece. They don't want it to break down into the pipe.

Accordingly, a review of the record reveals that Davis arranged the purchase of cocaine, transported the drug, which was later manufactured into crack cocaine. Davis later divided the drug into "12 T-Shirts," a slang term for 12 one gram bags. Therefore, Davis' Count 168 conviction under R.C. 2925.03(A)(2) with a special finding that the amount of cocaine exceeded 10 grams, but was less than 20 grams, is supported by sufficient evidence.

iii. Count 149

{¶ 43}   As to Count 149, the state presented evidence that on November 20, 2013, Davis contacted his brother, D-Block, to check on the supply of drugs.  The next day, Davis is heard collecting money so that he can pay for a resupply in Dayton.  At 6:54 PM, Davis tells his wife that he has to go to Xenia and Dayton and shows that he is extremely concerned about any further discussion about this topic on the phone stating "I mean why would you have me explain this over the phone.  You know what I'm going to do."

{¶ 44}   At 7:23 PM and 7:36 PM, Davis speaks with Zione and D-Block and advises that he's going to pick up the supply and asks D-Block to call Deb to pick him up.  At 7:43 PM, Davis speaks with Kline and advises him that he does not need a ride from him, but will have Deb to pick him up because he wants to fly under the radar and "them Police is out you hear me."  At 8:03 PM, Davis calls his wife and tells her that he will be riding with Deb.  At 8:37 PM, Davis calls one of his suppliers and states that he is not far away.  At 8:43 PM, Davis has a second call with Kline.  Kline asks why Davis didn't want him to drive.  Davis reassures Kline that he was "trying to be inconspicuous because I got a lot of shit on me you feel me.  And two black guys in your car right now, you know what I'm saying."  In other words, Davis wanted Deb to drive because Kline is white and it would arouse suspicion if he were driving two black men around.  Davis wanted another black person, Deb, to drive.

{¶ 45}   At 9:35 PM, Davis calls his dealer and tells him that he's right outside.  At 10:43 PM, Kline calls Davis and Davis states that he's almost back in town and Kline orders .4 grams of crack cocaine.  At 11:18 AM, the following morning, Davis has a conversation with an unidentified individual asking him to use his home to cook soft cocaine into crack and advising that he needs a Pyrex dish, baking soda and a metal hanger.

{¶ 46}   To explain the phone calls, the state had Detective Baker testify.  Detective Baker, analyzing several phone calls on that date and by testifying as to common practices of the organization, testified that Davis traveled to Dayton and obtained at least one ounce of

cocaine and returned to Wilmington with Deborah Ortiz. As explained by Detective Baker:

> You know, from the beginning of the first call when Phillip is asking them how much they have left and that he needs money so that he can go resupply up on Dayton, once he gains that money from [D-Block] and Khalif Zione, he then meets with Jason Thompson in Dayton, Ohio and then travels from Dayton, Ohio. That narcotics [sic] that he buys from Jason Thompson makes its way back here to Clinton County. And those calls are confirmed with [Zione] of stating, hey where you at.
>
> There were several times the guys would run out of drugs for anywhere from an hour up to three and four hours. So, they would continuously call like how long you going to be so that they can tell the users, hey, it's going to be a little bit.
>
> So, it was very common to hear those calls, where you at, where can I meet you at. And that day was a perfect example for that day is where he collected the cash, went to Dayton, Ohio, resupplied with the crack cocaine, and then brought that crack cocaine back to Wilmington, Clinton County, and distributed to his main couriers.

{¶ 47} As a result, we find the state presented sufficient evidence to sustain Davis' conviction in Count 149 of R.C. 2925.03(A)(2) with a special finding that the amount of cocaine exceeded 27 grams, but was less than 100 grams.

### C. Illegal Manufacture of Drugs

{¶ 48} As to Count 4, Davis was also convicted of one count of illegal manufacture of drugs in violation of R.C. 2925.04. R.C. 2925.04 states that "[n]o person shall knowingly cultivate marihuana or knowingly manufacture or otherwise engage in any part of the production of a controlled substance.

{¶ 49} While there were many instances in which Davis described his manufacturing, the state proceeded on only one count. On November 22 at 6:08 PM, Davis spoke with a known drug user and stated that he has "the soft" right now, which is a term for cocaine. Davis states that he had to put it "in a pot," which means that he will be manufacturing the cocaine into crack. Then Davis states that he will give the caller an eight ball (3.5 grams) for

$200.

{¶ 50} At 6:12 PM Davis speaks with Kline and asks Kline to have Deb come and get him. At 6:59 PM, Davis calls Kline and asks him to bring a Pyrex dish, baking soda, and a metal hanger, which are items used for the manufacture of crack. At 8:23 PM, Davis calls Kline looking for a place to cook the crack and Kline offers his residence. Davis accepts. At 9:09 PM, an unidentified individual is discussing the manufacturing process of crack with Davis. Using the testimony of Detective Baker, combined with the telephone recordings, the discussion involves the unidentified individual asking how much crack he will get for 14 grams of cocaine after manufacturing. Davis explains that he will get 14 grams, "you going to at least get what you put in." The individual states that he would like to get 18 grams out of the 14 grams. Detective Baker stated that you can increase the amount of crack made if the cocaine is a higher quality and you combine other ingredients to increase the yield. At 9:29 PM, Davis states the quantity that he was able to make "Ok, that shit jump you hear me. I just got 31 off of one you feel me. 31 and some." At 9:35 PM, Davis receives a call and states that he "just got out the kitchen," which Detective Baker testified means that he just completed the manufacturing process. Detective Baker testified that all of these conversations transpired over the course of less than three hours and Davis' presence was confirmed at Kline's house that day by undercover surveillance teams.

{¶ 51} Based on our review, we conclude that the state presented sufficient evidence that Davis knowingly manufactured a controlled substance in violation of R.C. 2925.04.

### D. Aggravated Trafficking in Drugs

{¶ 52} As to Count 347, Davis was convicted of Aggravated Trafficking in Drugs in violation of R.C. 2925.03. Again, the relevant provision states:

(A) No person shall knowingly do any of the following:

\* \* \*

(2) Prepare for shipment, ship, transport, deliver, prepare for distribution, or distribute a controlled substance or a controlled substance analog, when the offender knows or has reasonable cause to believe that the controlled substance or a controlled substance analog is intended for sale or resale by the offender or another person.

**{¶ 53}** On December 16, 2013, Davis made two calls to two separate individuals, bragging or informing them that he was in possession of "glass," a slang term for crystal methamphetamine. Davis later calls Zione and tells him that he has half an ounce, or 14 grams, to sell. Detective Baker testified that the bulk amount of methamphetamine is three grams. Therefore, Davis possessing 14 grams satisfies the specification requirement, i.e., bulk amount, but is less than five times the bulk amount. R.C. 2925.03(C)(1)(c). Accordingly, there is sufficient evidence on this count.

### E. Engaging in a Pattern of Corrupt Activity

**{¶ 54}** Finally, as to Count 1, Davis was convicted of engaging in a pattern of corrupt activity. As previously noted, this count is defined in R.C. 2923.32, which states that: "[n]o person employed by, or associated with, any enterprise shall conduct or participate in, directly or indirectly, the affairs of the enterprise through a pattern of corrupt activity." Again, for purposes of this case, "corrupt activity" means "engaging in, attempting to engage in, conspiring to engage in, or soliciting, coercing, or intimidating another person to engage in" a violation of R.C. 2925.03 or R.C. 2925.04.

**{¶ 55}** Davis was convicted of 25 counts of trafficking in drugs, illegal manufacture of drugs, and aggravated trafficking in drugs. Contrary to Davis' contentions, these convictions were properly tried in Clinton County and were supported by sufficient evidence. As indicated above, the state presented evidence that Davis was the leader of the Marlena Park Gang and presented voluminous records and voice records wherein Davis would direct members of the organization to act on his behalf and sell drugs. Through the use of phone

records and testimony from those involved with the organization, the state presented sufficient evidence to show that Davis engaged in a pattern of corrupt activity through his illicit drug activity. Accordingly, we find Davis' conviction for engaging in a pattern of corrupt activity was supported by sufficient evidence.

### III. Conclusion

{¶ 56} Based on the foregoing, we find Davis' convictions were supported by sufficient evidence. Although many of the conversations and rituals involved coded language and drug terminology, we find that a rational trier of fact could have found all essential elements to find Davis guilty on all counts. *See State v. Short*, 8th Dist. Cuyahoga No. 83804, 2005-Ohio-4578, ¶ 21. Therefore, we find Davis' first assignment of error is without merit and is overruled.

{¶ 57} Assignment of Error No. 2:

{¶ 58} THE DEFENDANT'S CONVICTIONS ARE NOT SUPPORTED BY THE MANIFEST WEIGHT OF THE EVIDENCE.

{¶ 59} In his second assignment of error, Davis alleges that his convictions are against the manifest weight of the evidence. We again disagree.

{¶ 60} A manifest weight challenge concerns the inclination of the greater amount of credible evidence, offered in a trial, to support one side of the issue rather than the other. *State v. Vunda*, 12th Dist. Butler Nos. CA2012-07-130 and CA2013-07-113, 2014-Ohio-3449, ¶ 34. In assessing whether a conviction is against the manifest weight of the evidence, a reviewing court examines the entire record, weighs the evidence and all reasonable inferences, considers the credibility of the witnesses, and determines whether, in resolving conflicts in the evidence, the trier of fact clearly lost its way and created such a manifest miscarriage of justice that the conviction must be reversed and a new trial ordered. *State v. Sess*, 12th Dist. Butler No. CA2015-06-117, 2016-Ohio-5560, ¶ 13.

- 24 -

{¶ 61}   While appellate review includes the responsibility to consider the credibility of witnesses and weight given to the evidence, "these issues are primarily matters for the trier of fact to decide." *State v. Shindeldecker*, 12th Dist. Preble No. CA2015-06-014, 2016-Ohio-264, ¶ 16. Therefore, an appellate court will overturn a conviction due to the manifest weight of the evidence only in extraordinary circumstances to correct a manifest miscarriage of justice, and only when the evidence presented at trial weighs heavily in favor of acquittal. *Id.*

{¶ 62}   As noted above, the state presented overwhelming evidence of Davis' guilt in this matter. The evidence included dozens of phone conversations between Davis and his associates and customers. The testimony from several associates and customers further corroborated those phone calls and the common practices utilized in Davis' drug operation. Simply stated, the jury had ample evidence to sustain Davis' convictions on all charges and we do not find that the jury's decision was against the manifest weight of the evidence. Accordingly, Davis' second assignment of error is without merit.

{¶ 63}   Assignment of Error No. 3:

{¶ 64}   THE DEFENDANT WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL.

{¶ 65}   In his third assignment of error, Davis argues that he was denied effective assistance of counsel. Davis asserts that his trial counsel failed to object to "many portions" of testimony that he claims were improper and stating "[n]o one can read the transcripts and not ascertain that many, many questions and answers should have been objected to by trial counsel whether the basis was hearsay, relevancy, lack of foundation, etc." We disagree with Davis' claim.

{¶ 66}   To prevail on an ineffective assistance of counsel claim, an appellant must establish: (1) that his trial counsel's performance was deficient; and (2) that such deficiency prejudiced the defense to the point of depriving the appellant of a fair trial. *Strickland v. Washington*, 466 U.S. 668, 687-688, 104 S.Ct. 2052 (1984); *State v. Vore*, 12th Dist. Warren

Nos. CA2012-06-049 and CA2012-10-106, 2013-Ohio-1490, ¶ 14. Trial counsel's performance will not be deemed deficient unless it "fell below an objective standard of reasonableness." *Strickland* at 688. To show prejudice, the appellant must prove there exists "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Id.* at 694. An appellant's failure to satisfy one prong of the Strickland test negates a court's need to consider the other. *State v. Madrigal*, 87 Ohio St.3d 378, 389 (2000).

{¶ 67} We have carefully reviewed the entirety of the transcript and find that Davis' trial counsel was not ineffective. While Davis vaguely asserts that there were "many portions" of testimony that were objectionable, we do not concur with Davis' assessment that his trial counsel was ineffective. Trial counsel is not ineffective for failing to object at every potential moment in a case and declining to object may be considered trial strategy. As noted by the Ohio Supreme Court:

> [E]xperienced trial counsel learn that objections to each potentially objectionable event could actually act to their party's detriment. * * * In light of this, any single failure to object usually cannot be said to have been error unless the evidence sought is so prejudicial * * * that failure to object essentially defaults the case to the state. Otherwise, defense counsel must so consistently fail to use objections, despite numerous and clear reasons for doing so, that counsel's failure cannot reasonably have been said to have been part of a trial strategy or tactical choice.

*State v. Johnson*, 112 Ohio St.3d 210, 2006-Ohio-6404, ¶ 140, citing *Lundgren v. Mitchell*, 440 F.3d 754, 774 (6th Cir. 2006).

{¶ 68} Davis' scattershot attempt to argue that certain portions of testimony should have been objected to neither present an accurate representation of what occurred at trial, nor do they explain a basis for objection. For example:

> Examples of trial counsel's ineffectiveness can be found as followed [sic]: Given nature of the evidence (and lack thereof),

Detective Baker's first sixty pages of testimony contains hearsay and irrelevant information that trial counsel never objected to, such as having two informants killed (T.p. 313), we based the opinion (T.p. 314-15), a leak involving search warrants (T.p. 316), "we did a complete chart of the entire drug trafficking organization" (T.p. 325), "Mark Burch lived in the residence that Khalif Zione had gave to his probation officer" (T.p. 328), testifying about what an undercover officer saw and believed (T.p. 330), and that the surveillance units confirmed who as [sic] actually there for the transaction (T.p. 330). Similarly, Detective Baker was allowed to testify about events to which he had no personal knowledge: a traffic stop that occurred by a state highway patrolman (T.p. 417), a second traffic stop that occurred in Warren County and that methamphetamine was located inside the vehicle. (T.p. 424), and drug transactions by undercover officers and what other individuals said (T.p. 429-30, 351, 355, 407).

{¶ 69} In addition, Davis complains that "trial counsel did not object to improper statements made by the prosecutor during closing argument," but declines to address which statements were objectionable. However, having reviewed the record, we find Davis' argument to be without merit. Davis has not shown that his counsel was ineffective, nor has he shown that the outcome of the trial would have been different but for these objections and decisions by counsel. Rather, as noted above, Davis was convicted based on overwhelming evidence presented at trial. Accordingly, Davis' third assignment of error is overruled.

{¶ 70} Assignment of Error No. 4:

{¶ 71} THE TRIAL COURT ERRED IN DENYING THE DEFENDANT'S MOTION TO SUPPRESS.

{¶ 72} In his fourth assignment of error, Davis alleges the trial court erred by failing to suppress the evidence obtained from the federal wiretap. In his appellate brief, Davis argues that the trial court erred by denying his motion to suppress and challenges the validity of the federal wiretap order because "other investigative measures could have been undertaken and had not been shown to be unsuccessful." Davis claims the federal wiretap order thus violates 18 U.S.C. 2518(1)(c), which requires an affidavit in support of federal wiretap

authority contain a "full and complete statement as to whether or not other investigative procedures have been tried and failed or why they reasonably appear to be unlikely to succeed if tried or to be too dangerous."

{¶ 73} Appellate review of a ruling on a motion to suppress presents a mixed question of law and fact. *State v. Brannon*, 12th Dist. Clinton No. CA2014-09-012, 2015-Ohio-1488, ¶ 24. When considering a motion to suppress, the trial court, as the trier of fact, is in the best position to weigh the evidence in order to resolve factual questions and evaluate witness credibility. *State v. Cruz*, 12th Dist. Preble No. CA2013-10-008, 2014-Ohio-4280, ¶ 12. Therefore, when reviewing the denial of a motion to suppress, a reviewing court is bound to accept the trial court's findings of fact if they are supported by competent, credible evidence. *State v. Clarke*, 12th Dist. Butler No. CA2015-11-189, 2016-Ohio-7187, ¶ 19. "An appellate court, however, independently reviews the trial court's legal conclusions based on those facts and determines, without deference to the trial court's decision, whether as a matter of law, the facts satisfy the appropriate legal standard." *State v. Durham*, 12th Dist. Warren No. CA2013-03-023, 2013-Ohio-4764, ¶ 14.

{¶ 74} A review of the hearing and memoranda in support of Davis' motion to suppress, however, reveals that this argument was not raised below and is therefore waived. Instead, at the trial court level, Davis alleged that Ohio constitutional and statutory law precluded local authorities from using and relying upon evidence obtained from a federal wiretap pursuant to R.C. 2933.52, which is titled "[p]rohibition against interception of communications; exceptions." As the trial court correctly concluded, Davis' contention below was without merit as Ohio statutes specifically provides that R.C. 2933.52(B) explicitly exempts application of that rule if a federal wiretap order has been properly issued.

{¶ 75} The issue that Davis now raises with respect to 18 U.S.C. 2518(1)(c) was not preserved below. As noted by the trial court in its entry, the hearing in support of the motion

to suppress comprised of stipulated exhibits and a request for time to file post-hearing briefs and '[n]o fact testimony was presented or needed." Accordingly, as Davis failed to raise this factual issue below, we may not consider it for the first time on appeal. *State v. Vaughn*, 12th Dist. Fayette No. CA2014-05-012, 2015-Ohio-828, ¶ 9; *Columbus v. Ridley*, 10th Dist. Franklin No. 15AP-84, 2015-Ohio-4968, ¶ 28 ("'It is well-settled law that issues not raised in the trial court may not be raised for the first time on appeal because such issues are deemed waived.' * * * This well-settled waiver rule applies to arguments not asserted either in a written motion to suppress or at the suppression hearing").

{¶ 76} Moreover, we also note that the evidence produced at trial would directly contradict Davis' argument on appeal. As the state argues in its brief, and as supported by the record, law enforcement officers testified that a wiretap was necessary because a previous undercover drug buy with Zione, one of Davis' dealers, had gone bad and it was not safe to place additional individuals in harm's way. Additionally, the state presented evidence that the wiretap was the best means to learn the roles of the members of the organization and try to determine the identity of the supply source. Accordingly, we find Davis' fourth assignment of error is without merit and is hereby overruled.

{¶ 77} Assignment of Error No. 5:

{¶ 78} THE DEFENDANT'S SENTENCES INCLUDING THE PENALTY ENHANCEMENTS TO HIGHER LEVEL FELONIES ARE CONTRARY TO THE LAW.

{¶ 79} In his fifth assignment of error, Davis argues that his sentence is contrary to law. We find no merit to Davis' argument.

{¶ 80} This court reviews felony sentences pursuant to the standard of review set forth in R.C. 2953.08(G)(2) to determine whether the imposition of those sentences is clearly and convincingly contrary to law. *State v. Julious*, 12th Dist. Butler No. CA2015-12-224, 2016-Ohio-4822, ¶ 8. Pursuant to that statute, an appellate court may modify or vacate a

sentence only if, by clear and convincing evidence, "the record does not support the trial court's findings under relevant statutes or that the sentence is otherwise contrary to law." *State v. Harp*, 12th Dist. Clermont No. CA2015-12-096, 2016-Ohio-4921, ¶ 7. A sentence is not clearly and convincingly contrary to law where the trial court considers the purposes and principles of sentencing as set forth in R.C. 2929.11, as well as the seriousness and recidivism factors listed in R.C. 2929.12, and sentences a defendant within the permissible statutory range. *State v. Brandenburg*, 12th Dist. Butler Nos. CA2014-10-201 and CA2014-10-202, 2016-Ohio-4918, ¶ 9.

{¶ 81} Davis argues that the specifications leading to his penalty enhancements based on the weight of controlled substance are contrary to law. Specifically, Davis' argument relies on a similar proposition that we addressed with regard to his sufficiency and manifest weight arguments. According to Davis, the imposition of penalty enhancements was improper because the state did not introduce the illegal substance as evidence. However, as addressed in Davis' first assignment of error, the holding in *Chandler* "does not apply to situations where no drug is recovered and no testing is performed." *Garr*, 2010-Ohio-2449 at ¶ 28. Consistent with *Garr*, Davis may be convicted of the relevant weight specifications. Here, as addressed in Davis' first assignment of error, the state presented testimony on each charge that the weight of the drug satisfied the statutory requirements and therefore there was no error in imposing the relevant penalty enhancements.

{¶ 82} Finally, although not raised in a separate assignment of error, Davis raises one final, conclusory challenge to his sentence, alleging that the trial court erred when it did not merge the drug trafficking and illegal manufacturing as allied offenses. However, as noted above, the state presented overwhelming evidence of each offense, none of which were allied offenses. Davis' sentence is not contrary to law. Therefore, Davis' fifth assignment of error is overruled.

{¶ **83**}   Judgment affirmed.


M. POWELL, P.J., and HENDRICKSON, J., concur.